# No. 22-2010

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

LORETTA SABRINA MARSHALL**,** individually
and on behalf of all others similarly situated,

*Plaintiff-Appellee*,

v.

GEORGETOWN MEMORIAL HOSPITAL,
d/b/a Tidelands Health,

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the District of South Carolina**

## BRIEF OF APPELLEE

Shelby Leighton
PUBLIC JUSTICE
1620 L ST. NW, Suite 630
Washington, DC 20036
(202) 797-8600
sleighton@publicjustice.net

David A. Nauheim
NAUHEIM LAW OFFICE, LLC
PO Box 31458
Charleston, SC 29417
(843) 534-5084
david@nauheimlaw.com

*Counsel for Appellee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................ 2

STATEMENT OF THE CASE ............................................................................ 3

I.      Tidelands requires new hires to pass a physical agility test ......................... 3

II.     Tidelands implemented an online application process that treats initial
        and subsequent applications differently with regard to arbitration ............... 4

        A.      Initial application ............................................................................... 5

        B.      Subsequent applications .................................................................... 6

III.    Ms. Marshall submitted multiple applications for jobs at Tidelands
        using its online system, including in 2016 and 2020 ...................................... 9

IV.     Tidelands' system falsely records that an applicant has agreed to
        arbitration even if they do not click "submit" ............................................... 10

V.      Even after Tidelands tried a new legal theory and submitted new
        evidence, the district court denied its motion to compel arbitration ............. 11

SUMMARY OF ARGUMENT ............................................................................ 17

ARGUMENT ...................................................................................................... 20

I.      Because arbitration is a matter of consent, the FAA's "strong federal
        policy favoring arbitration" does not apply to contract formation disputes,
        nor does it permit courts to favor arbitration agreements when applying
        state contract law ............................................................................................. 20

II.     The district court correctly held Tidelands has not met its burden of
        proving the existence of an arbitration agreement that covers Ms.
        Marshall's claims ............................................................................................ 22

        A.      Tidelands cannot show Ms. Marshall had notice she was being
                offered an arbitration agreement that covered her 2020
                application ........................................................................................ 23

                i.      The top of Tidelands' application webpage did not provide
                        Ms. Marshall with notice of the offer to enter into a contract .. 24

i

        ii.    The already-completed agreement at the bottom of the page did not provide Ms. Marshall with notice of a new offer to enter into a contract ................................................................. 30

    B.    Tidelands has not met its burden of proving that Ms. Marshall assented to the arbitration agreement by clicking "submit" .............. 32

        i.    The top of Tidelands' application page did not provide notice that clicking "submit" would manifest assent to an arbitration agreement ................................................. 33

        ii.    The already-checked box at the bottom of the page did not provide notice that clicking submit would constitute acceptance of the agreement ...................................... 35

III.    Even if an arbitration agreement was formed in 2020, the district court's decision should be affirmed on the alternative ground that the 2020 agreement does not cover this dispute ............................................ 37

CONCLUSION ...................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)....................................................................39

*Clark v. Goldline Int'l, Inc.*,
    2010 WL 4929438 (D.S.C. Nov. 30, 2010).......................................28

*Doe v. Princess Cruise Lines, Ltd.*,
    657 F.3d 1204 (11th Cir. 2011) .................................................38, 39

*Edens v. Laurel Hill, Inc.*,
    271 S.C. 360, 364 (S.C. 1978)......................................................22

*First Baptist Church of Timmonsville v. George A. Creed & Son, Inc.*,
    276 S.C. 597 (S.C. 1981) ............................................................30

*Fleming v. Borden, Inc.*,
    316 S.C. 452 (S.C. 1994)............................................................23

*Granite Rock Co. v. Int'l Broth. of Teamsters*,
    561 U.S. 287 (2010)........................................................20, 37, 41

*Herron v. Century BMW*,
    387 S.C. 526 (S.C. 2010) ............................................................30

*Hines v. Overstock.com, Inc.*,
    668 F. Supp. 2d 362 (E.D.N.Y. 2009) .............................................26

*Lampo v. Amedisys Holding, LLC*,
    437 S.C. 236 (S.C. Ct. App. 2022) ...........................................*passim*

*Lamps Plus, Inc. v. Varela*,
    139 S.Ct. 1407 (2019)..............................................................20, 39

*Malone v. Greenville Cnty.*,
    2008 WL 4557498 (D.S.C. Aug. 11, 2008)........................................40

*Mears Group, Inc. v. Kiawah Island Utility, Inc.*,
    372 F. Supp. 3d 363 (D.S.C. 2019) ................................................39

*Meyer v. Uber Technologies, Inc.*,
    868 F.3d 66 (2d Cir. 2017) ...............................................26, 33, 34, 36

*Morgan v. Sundance, Inc.*,
    142 S.Ct. 1708 (2022)....................................................................21

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
    460 U.S. 1 (1983)...........................................................................40

*Moultry v. Tony Serra Ford, Inc.*,
    2019 WL 2392443 (N.D. Ala. June 6, 2019) ..................................27, 28, 31, 36

*Munoz v. Green Tree Fin. Corp.*,
    343 S.C. 531 (S.C. 1981) ................................................................30

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v.
    Travelers Ins. Co.*,
    514 U.S. 645 (1995)........................................................................38

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ...................................................25, 33

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) .............................................................29

*Raymond James Fin. Servs., Inc. v. Cary*,
    709 F.3d 382 (4th Cir. 2013) ...........................................................21

*Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*,
    993 F.3d 253 (4th Cir. 2021) .................................................20, 21, 22

*Ryals v. ILA Local 1771*,
    33 F.Supp.3d 634 (D.S.C. 2014) .....................................................39

*Selden v. Airbnb, Inc.*,
    4 F.4th 148 (D.C. Cir. 2021).....................................................26, 33, 34

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ..................................................26, 33, 34

*Sonic Automotive, Inc. v. Watts*,
    563 U.S. 971 (2011).......................................................................30

*Specht v. Netscape Comms. Corp.*,
306 F.3d 17 (2d Cir. 2002) ................................................................25, 29, 33

*Strother v. Lexington Cnty. Rec. Comm'n*,
332 S.C. 54 (S.C. 1998) .................................................................................23

*Sutton v. Coinbase, Inc.*,
354 F. Supp. 3d 156 (E.D.N.Y. 2019) .............................................................36

*Viking River Cruises, Inc. v. Moriana*,
142 S.Ct. 1906 (2022)..............................................................................37, 41

*Volt Inform. Sciences v. Bd. of Trustees of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989)..................................................................................20, 38

## Statutes

42 U.S.C. § 12112....................................................................................1, 40

42 U.S.C. § 2000e–2...................................................................................1

9 U.S.C. §§ 1-16.......................................................................................20

## Other Authorities

Restatement (Second) of Contracts § 19.................................................32

Restatement (Second) of Contracts § 50.................................................32

1 Williston on Contracts § 4:16 (4th ed.)..............................................23

## INTRODUCTION

This putative class action challenges the practice of Appellant Georgetown Memorial Hospital, known as Tidelands Health ("Tidelands"), of excluding new hires from its workforce who cannot pass a physical agility test. The suit alleges that, because the physical agility test does not test employees' ability to perform the essential functions of their jobs, it is unlawful discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, and disproportionately excludes women and people with disabilities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and the ADA.

The issue on appeal is whether Tidelands can use a hidden arbitration agreement in its online employment application to avoid a class-wide challenge to its discriminatory practice and force Plaintiff-Appellee Loretta Sabrina Marshall to individually arbitrate her claims. In support of its motion to compel arbitration, Tidelands initially relied on an arbitration agreement that Ms. Marshall signed when she applied for a job in 2016. But when the Magistrate Judge held that agreement applied only to her 2016 application, not her 2020 application, Tidelands changed course and argued that, by submitting a new application in 2020, Ms. Marshall automatically agreed to a new arbitration agreement that covered her 2020 claims. But that argument is fatally flawed because Tidelands' website did not tell Ms. Marshall that submitting an updated application meant that she was agreeing to arbitration. In

1

fact, she could update and submit her online application without ever seeing an arbitration agreement at all.

To show that an arbitration agreement was formed under South Carolina law, Tidelands must prove both that Ms. Marshall had notice of the terms of the agreement Tidelands was offering her *and* that she had notice of how to accept those terms. It has proved neither. Moreover, even if it did, it would face another hurdle: the purported 2020 arbitration agreement does not even cover the claims at issue here. For those reasons, this Court should affirm the district court's order denying Tidelands' motion to compel arbitration.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the district court correctly held that Tidelands failed to meet its burden to prove an arbitration agreement was formed between Ms. Marshall and Tidelands, where Tidelands did not show that Ms. Marshall had notice of the arbitration agreement's terms or the conduct that would manifest assent to the agreement.

2.     Whether the district court's order should be affirmed on the alternative ground that Ms. Marshall's discrimination claims in this case—which are based on Tidelands' medical examination after she was offered and accepted employment— fall outside the scope of the arbitration agreement, which applies only to claims arising out of the application and application process.

## STATEMENT OF THE CASE

### I.    Tidelands requires new hires to pass a physical agility test

Tidelands is a large healthcare provider in South Carolina. JA 7. Since at least 2010, Tidelands has required new hires to pass a strength and physical agility test.[1] JA 6; JA 8. The new hire is strapped into a computer driven device and performs range-of-motion exercises with their knees and shoulders against resistance created by the device. JA 8-14. Tidelands terminates the new hire if they cannot pass the test. JA 16.

Appellee Loretta Sabrina Marshall brought a putative class action to challenge Tidelands' use of this test after she was terminated for failing it. In her complaint, she alleges that there is no connection between the test and an individual's ability to perform the essential functions of their job. JA 25-26. Instead, she alleges that the true purpose of the test is to lower Tidelands' health insurance, pharmacy, and worker's compensation costs by screening out applicants who do not have an ideal strength to weight ratio. JA 14-16. She alleges that the practice discriminates against people with disabilities in violation of the ADA, and that it has a disparate impact on people with disabilities and women in violation of Title VII and the ADA. JA 35-36. She also contends that using the test to prevent applicants from obtaining future

---

[1] This test is also referred to as a Physical Agility Test or "PAT."

3

benefits violates the Employment Retirement Income Security Act (ERISA). JA 36-38.

Ms. Marshall has been a licensed RN in the state of South Carolina since 2007. JA 18. She was employed by Tidelands as an RN from 2008 to 2011. *Id.* In 2011, she left to work elsewhere but shortly thereafter decided she wanted to return. JA 19. By then, Tidelands had begun requiring new hires to pass the physical agility test. *Id.* Between 2011 and 2020, Ms. Marshall applied for and was offered multiple positions by Tidelands, only to have the offer withdrawn after she was unable to pass the post-offer test. JA 19-20.

The claims in this case arise from the physical agility test that Tidelands gave Ms. Marshall in July 2020. Like the earlier tests, it was only *after* Tidelands extended a job offer and Ms. Marshall accepted that Tidelands told her that she was required to complete the physical agility test "in order to attend orientation." JA 20-21. Ms. Marshall did not pass the test, and Tidelands terminated her employment without ever engaging in the ADA interactive process. JA 23. She then filed this putative class action with the goal of ending the practice. JA 26.

## II.  Tidelands implemented an online application process that treats initial and subsequent applications differently with regard to arbitration

In 2016, Tidelands implemented a new online application process, which included an attempt to bind applicants to an arbitration agreement covering any disputes arising out of the application process. *See* JA 188. The online application

4

process treats an applicant's initial application differently from subsequent applications in a significant way: only during the initial application is the applicant required to affirmatively check a box to accept an arbitration agreement.

A.    *Initial application*

When an applicant first uses Tidelands' online job application system, they must input personal information and create a profile. JA 152-153. After filling out the application, the applicant necessarily must scroll through an arbitration agreement labeled "Pre-Employment Statement." JA 45. The language of the Pre-Employment Statement makes clear that it applies only to the current application and the application process associated with it. *See* JA 45, 50 ("Both you and Tidelands Health agree to resolve any and all claims, disputes or controversies arising out of or relating to *your application for employment and application process* exclusively by arbitration") (emphasis added). Under the agreement is a blank check box labeled "I ACCEPT." JA 159. The box is accompanied by language explaining that checking the box means the applicant is agreeing to the Pre-Employment Statement generally, and arbitration specifically, as shown in the below screen shot. JA 52; JA 159.

> networks or devices. Accordingly, I agree to permit such parties to make such transmissions and changes, and hereby provide the necessary consent for the same.
>
> ☑ **I ACCEPT** LORETTA MARSHALL 4/12/2016 9:35 AM
>
> By checking the box above next to the "I ACCEPT" button, I am applying my e-signature, which is just as valid as my handwritten signature, and agreeing to the PRE-EMPLOYEMNT STATEMENT which contains the Agreement to Arbitrate, and other items all of which I am agreeing to, certifying, and admitting that I understand those provisions.

An applicant cannot submit the initial application until the "I ACCEPT" box has been checked. JA 187. Thus, during the initial application, Tidelands makes it clear to the applicant that they are being offered an "Agreement to Arbitrate" and that checking the "I ACCEPT" box binds them to that agreement when they submit their application, just as if they had signed the agreement by hand. Tidelands also ensures that the applicant has scrolled past the arbitration agreement *before* they are able to click the "I ACCEPT" box.

### B.    *Subsequent applications*

In contrast, on subsequent applications, the applicant is *not* required to check an "I ACCEPT" box or otherwise take any affirmative action to indicate agreement to arbitration. Instead, the applicant is given an opportunity to update the information in the application and apply for a job by clicking a "submit" button at the top of the page without ever viewing the agreement or the "I ACCEPT" box. *See* JA 202. Specifically, upon navigating to Tidelands' Career Webpage, a returning applicant can select a position and click "apply to this job online." JA 186. The website then

prompts them to login with their username and password, which brings up their existing employment application, already populated with the information they used for their last application. JA 186; JA 202. Without scrolling down, the applicant can see and make changes to their pre-populated application without ever seeing the arbitration agreement, which is hidden below the application. *See* JA 202; JA 267-268. Once the applicant is satisfied with the information in the application, they can click the "submit" button, which Tidelands chose to place at the top of the page. This transmits the application to Tidelands without the applicant needing to scroll to the bottom of the page where the agreement and "I ACCEPT" box are located. JA 202; JA 259; JA 267.

Notably, there is no language around the "submit" button at the top of the page advising the applicant that by clicking the "submit" button, the applicant is agreeing to arbitration. JA 202. Nor is there any language pointing the applicant to the contract terms that are further down the page, which do not become visible to the applicant unless they choose to scroll down. JA 202; 267-268. The below screen shot provided by Tidelands illustrates what—at most—would be visible to an applicant updating their application. JA 202.



If the applicant does choose to scroll all the way down before clicking "submit," they will see the "Pre-Employment Statement" with the "I ACCEPT" box already checked, and their name and the date of their initial application next to the box, indicating that they had agreed to arbitration in connection with their initial application. JA 52; JA 203-204; JA 268-269.

In sum, Tidelands chose to design its online application system so that, on subsequent applications, an applicant is *not* required to scroll past the arbitration

8

agreement or check the "I ACCEPT" box before submitting their application, and there is no indication at the top of the page or near the "submit" button that an arbitration agreement is hidden below the application.

### III. Ms. Marshall submitted multiple applications for jobs at Tidelands using its online system, including in 2016 and 2020

Ms. Marshall first used the online system to apply for a job with Tidelands on April 12, 2016. JA 45. As described above, during her initial application, she was required to scroll through the "Pre-Employment Statement" containing the arbitration agreement and check the "I ACCEPT" box to electronically sign the agreement before submitting her application using the "submit" button. JA 45; JA 52. She then used the online system three more times to apply for jobs, including the application on June 26, 2020 that is at issue here. JA 188.

On subsequent applications, including her 2020 application, she was *not* required to scroll through the arbitration agreement and check the "I ACCEPT" box. This is not disputed. *See* Def's Br. at 7. Rather, she was given the opportunity to update the information on her application and then apply for the position by clicking the "submit" button at the top of the page without anything about the arbitration agreement ever appearing on her screen. *Id.*; JA 186-7; JA 364-5. And there was no language around the submit button indicating that clicking the submit button had any more significance than merely submitting her application. JA 202.

9

**IV.   Tidelands' system falsely records that an applicant has agreed to arbitration even if they do not click "submit"**

During the litigation in the district court regarding Tidelands' motion to compel, Ms. Marshall discovered that Tidelands' online portal generates fraudulent arbitration agreements. This fact came to light on September 29, 2021 when, in order to understand how the system works, Ms. Marshall and her counsel used her credentials to log into Tidelands' online application system. JA 266; 321. They went through the process of selecting a position and updating the application but stopped short of submitting an application. JA 266-269. Instead of clicking "submit," Ms. Marshall's counsel clicked "Save & Return Later." JA 269. The next day, Tidelands' counsel wrote Ms. Marshall's counsel a letter claiming he had learned that Ms. Marshall had just signed an arbitration agreement on September 29, 2021. JA 271-272. "Yes, you are reading that correctly," he wrote. "She 'signed' and submitted a revised application (with the arbitration and class waiver language) just this week." JA 272. The letter included a copy of the arbitration agreement that had been "signed" by Ms. Marshall. JA 292-296. In other words, though Ms. Marshall (through her counsel) had clicked "Save & Return Later," Tidelands' system generated a document purporting to show that she had clicked the "I ACCEPT" button on September 29, 2021 to agree to arbitration. JA 204; JA 296.

10

**V.    Even after Tidelands tried a new legal theory and submitted new evidence, the district court denied its motion to compel arbitration**

After this action was filed on August 24, 2021, Tidelands moved to compel arbitration based on the arbitration agreement that Ms. Marshall signed on April 12, 2016. JA 53. Marshall filed an Opposition Brief asserting that (1) the 2016 arbitration agreement on its face only applied to her 2016 application, not her 2020 application, JA 83-84; and (2) even if the 2016 agreement did apply to her 2020 application, it still did not include the present dispute in its scope because the agreement only applies to claims that arise out of the employment application and application process, whereas the challenged practice in question occurred *after* an offer of employment had been made. JA 86-96.

The Magistrate Judge filed a Report and Recommendation concluding that, "although Defendant has produced a signed Agreement related to Plaintiff's 2016 job application, Defendant has not shown that the Agreement applies to Plaintiff's 2020 job application." JA 125. The Magistrate Judge rejected Tidelands' attempt to characterize Marshall's application as "one single application that she 'updated' each time she sought employment," JA 128, reasoning that Ms. Marshall was never "informed that Defendant treated every time she applied for a job as a continuation of her 2016 application and Agreement. Nor is there any indication that Plaintiff ever agreed to those terms." JA 126-127. The Magistrate Judge was "not convinced that Plaintiff's attempts at securing a job with Defendant three and four years after her

11

initial application can all be considered a single application where nothing in the application or Agreement would have informed Plaintiff that all applications are considered to be one application." JA 129.

Tidelands filed objections to the Report and Recommendation and submitted new evidence: a declaration with four arbitration agreements—including one from June 26, 2020—that Ms. Marshall had purportedly agreed to. JA 218-222. It asked the court to compel arbitration based on the never-before-seen June 2020 agreement and dropped any challenge to the Magistrate Judge's finding that the 2016 agreement did not apply to this dispute. JA 133-134. In explaining how the 2020 agreement was formed, Tidelands made the contradictory assertions that Ms. Marshall both "*clicked* the box agreeing to the Agreement to Arbitrate and Class Waiver," JA 142 (emphasis added), and that Ms. Marshall had "indicated her acceptance to the Agreement to Arbitrate" by *failing to uncheck* the "I ACCEPT" box, JA 136 (emphasis added).

On February 14, 2022, in light of the new evidence submitted by Tidelands, the district court referred the matter back to the Magistrate Judge so the parties could fully brief the new issues related to the 2020 agreement. JA 235.

In its supplemental memorandum, Tidelands argued that, to submit her 2020 application, Ms. Marshall had to scroll through and accept the arbitration agreement language, and that, by choosing to submit her application without unchecking the "I ACCEPT" box, she had assented to a new arbitration agreement in 2020. JA 242-

12

244. Ms. Marshall responded that she did not have to scroll down to submit her 2020 application, and thus she lacked notice of any arbitration agreement or the "I ACCEPT" box. JA 252. Ms. Marshall also renewed her argument that the language of the arbitration agreement did not cover the present dispute. JA 264.

In a second Report and Recommendation on July 7, 2022, the Magistrate Judge reiterated her conclusion from the previous Report and Recommendation that Tidelands failed to establish that the 2016 arbitration agreement applied to the present dispute, either by its own terms or because the 2020 application was a continuation of the original application. *See* JA 315. Next, the Magistrate Judge addressed Tidelands' new argument, that "the process in 2020 was the same as it [was] in 2016," and that Ms. Marshall had "signed a new 'agreement to Arbitrate' . . . because she "*had to* review the language of the Agreement to Arbitrate, she *had to* review the 'I Accept' button and then take the affirmative step to submit the 2020 application by hitting the 'Submit button.' " JA 315 (emphasis in original).

The Magistrate Judge concluded that "Tidelands had not established that Marshall manifested her assent to the 2020 Arbitration Agreement." JA 318. She found that there was a "submit" button at the top of the page as well as the bottom, so an applicant could click "submit" without being on notice that she was "purportedly agreeing to arbitration because the applicant would have to scroll down a lengthy page to find the Agreement to Arbitrate language and the 'I ACCEPT'

13

button." *Id.* The Magistrate Judge further reasoned that using the word "submit" to label the button suggested that the applicant was submitting an application, and "does not, in its ordinary meaning, manifest assent to an agreement or acceptance of any terms and conditions." JA 319.

The Magistrate Judge also found that there was no "notice or explanation adjacent to or near the "submit" button explaining that by clicking "submit," the applicant is agreeing to any terms and conditions or that she would be bound to an arbitration agreement." *Id.* She found that even if Ms. Marshall did scroll to the bottom of the page past the arbitration agreement, the I ACCEPT box was already checked and time stamped from her 2016 application, and nothing on the page indicated that by submitting a new application her 2016 agreement would be "revived and converted into a new agreement to arbitration applicable to the 2020 Employment Application." JA 320. "Nor did it appear to be a new agreement that could be executed." *Id.* And the fact that the "I ACCEPT" box had a four-year-old time stamp "suggests that it was not clear to an applicant that by submitting the application, she was accepting those same terms again and creating a new agreement." *Id.* From these facts, the Magistrate Judge concluded that "attributing to [Plaintiff] knowledge of and assent to [Defendant's Agreement to Arbitrate] based on such a thin factual predicate would amount to rank speculation." JA 320-321.

The Magistrate Judge acknowledged that there was a three-line arbitration notice at the top of the employment application but found that it did not provide Ms. Marshall with the actual terms of the arbitration agreement, nor did it indicate that, by clicking "submit," the applicant was agreeing to the terms in the arbitration agreement. JA 310 n.8. Thus, the Magistrate concluded, the notice was insufficient to establish a "mutual manifestation of assent to all the terms of the contract." *Id.* (internal quotation marks omitted).

In addition, the Magistrate Judge found that she could not rely on the alleged 2020 arbitration agreement produced by Tidelands "when its online employment application system also generates signed, time- and date-stamped agreements without an applicant ever clicking the 'submit' button." JA 321-322.[2] The Magistrate Judge observed that, if all Tidelands' evidence showed was that the applicant had clicked "Save & Return Later," that does not show she manifested assent to anything. JA 322. This point was particularly troubling to the court because "[t]he mere act of showing up to the table is not sufficient to establish a meeting of the minds such that a valid, binding contract has been formed." *Id.* As a result, the Magistrate Judge concluded that Tidelands had not met its burden to establish the existence of an enforceable arbitration agreement. JA 322-323.

---

[2] The Magistrate observed that it was questionable whether the changes made by Ms. Marshall had been saved correctly by Tidelands' system as the 2016 arbitration agreement Tidelands submitted contained a "Date Available to Start" of 7/1/2020. JA 322 n.11 (citing JA 49).

15

Tidelands objected to the Report and Recommendation, arguing that, although Ms. Marshall may have not scrolled to the bottom of the page and may never have seen the arbitration agreement, her failure to do so was not a defense. JA 332. Tidelands also reiterated its argument that she manifested her assent by her conduct by clicking the "submit" button and asking Tidelands to consider her for a position because she "knew" the application she submitted in 2016 was subject to arbitration. JA 333.

On September 6, 2022, the district court issued its Order and Opinion adopting the Report and Recommendation. The court noted that Tidelands had not objected to the Magistrate Judge's finding that the 2016 arbitration agreement does not apply to the present dispute. JA 364. And the court found the Magistrate Judge correctly concluded that Tidelands had not met its burden to show that an arbitration agreement had been formed in Ms. Marshall's 2020 application. *Id.*

First, the court found that the Magistrate Judge correctly rejected, based on evidence submitted by Tidelands itself, Tidelands' contention that Ms. Marshall had to scroll through the arbitration agreement to submit her revised application. JA 365. The Court reasoned that there was no notice at the top of the 2020 employment application that, by clicking the submit button, the applicant was agreeing to any terms or conditions or that she would be bound by an arbitration agreement. The court agreed with the Magistrate Judge that the word submit "does not mean assent

16

to an agreement." JA 365-6. The court also agreed that the text at the top of the application referring to an arbitration agreement was "not sufficient to form a binding arbitration agreement in this context." JA 366.

Second, the court rejected Tidelands' argument that Ms. Marshall manifested assent by her conduct, explaining that the *Lampo* case submitted by Tidelands was unavailing because "Tidelands' online application system did not require Plaintiff to take the explicit actions the defendant's email in *Lampo* did." JA 367. The court quoted with approval Ms. Marshall's observation that "Defendant "could have easily required the applicant to scroll past the arbitration agreement before they could click submit, but chose not to do so." *Id.* (quoting JA 351). The court overruled Tidelands' objections, adopted the Report and Recommendation, and denied Tidelands motion to compel arbitration. JA 367. Tidelands appealed.

## SUMMARY OF ARGUMENT

The district court correctly denied Tidelands' motion to compel because Tidelands did not meet its threshold burden of proving that an arbitration agreement covering this dispute was formed. Indeed, Tidelands was unable to show either that Ms. Marshall had notice of an offer to enter into an arbitration agreement in 2020 or that she had notice that submitting her employment application would manifest assent to a contract. Unable to prove that Ms. Marshall in fact viewed the arbitration agreement or knew that submitting her application would constitute assent to it—

17

which is already fatal under South Carolina's "actual notice" standard—Tidelands resorts to distorting the facts and citing to general principles like the Federal Arbitration Act's "strong federal policy favoring arbitration" and the rule that a party is presumed to have read a contract before signing. Those efforts to resurrect its failed arbitration agreement should be rejected for the following reasons.

**First**, the FAA promotes the enforcement of arbitration *agreements*. If no agreement to arbitrate was formed in the first place under state law, the FAA's policy favoring enforcement of arbitration agreements does not apply. Moreover, the Supreme Court has recently confirmed that state law cannot be applied to "favor" arbitration agreements over other contracts. Putting these two key principles together, the FAA does not impact the question before the Court: whether Tidelands has proved that a valid agreement was formed in 2020 under South Carolina law.

**Second**, to prove that a valid agreement was formed under South Carolina law, Tidelands must show that Ms. Marshall had both notice of an offer to enter into a contract and notice of what she must do to manifest her assent to that contract. She had neither.

Regarding notice of the contract, Ms. Marshall could update and submit her employment application by clicking a "submit" button at the top of the page without scrolling down to see that an arbitration agreement could be found below the application. And unlike when a party has notice there is a contract but simply fails

18

to read it, nothing on the part of the page she viewed to update her application indicated that there were contract terms hidden below the application. Tidelands would have the Court hold that she was required to guess the hidden contract existed, but that absurd rule should be rejected as contrary to the very concept of notice. Moreover, even if Ms. Marshall scrolled down and saw the arbitration agreement, at most what she would have seen was that she had previously agreed to arbitration in 2016, and thus Tidelands failed to put her on notice of an offer to enter into a new agreement covering her 2020 application.

Regarding assent to the contract, clicking the "submit" button cannot have manifested Ms. Marshall's assent because nothing at the top of the page where Ms. Marshall updated her application provided notice that clicking "submit" would bind her to an arbitration agreement. And even if she scrolled down, the "I ACCEPT" box at the bottom of the page was already checked with her name and a 2016 date next to it, suggesting that she had already agreed to arbitration in 2016, not that, by clicking "submit," she was agreeing to a new arbitration agreement in 2020. In sum, because Tidelands cannot show that Ms. Marshall had notice of the existence of the hidden agreement or that, by submitting her application, she was manifesting assent to be bound by it, the district court correctly denied Tidelands' motion to compel.

**Third,** even if the Court concludes that a valid agreement to arbitrate was formed in 2020—which it was not—the Court should affirm the district court's

19

decision on the alternative ground that the agreement does not cover this dispute. The agreement applies only to disputes that arise out of or relate to Ms. Marshall's employment application or application process. But this suit concerns events that happened after Ms. Marshall was offered a job and accepted it. Therefore, it concerns the parties' employment relationship, not Ms. Marshall's application. Tidelands easily could have expanded the scope of the agreement to cover claims arising out of Ms. Marshall's employment, and the Court should take its intentional choice to use limiting language at face value and conclude that this dispute is beyond the agreement's scope.

## ARGUMENT

**I.    Because arbitration is a matter of consent, the FAA's "strong federal policy favoring arbitration" does not apply to contract formation disputes, nor does it permit courts to favor arbitration agreements when applying state contract law**

Tidelands relies extensively on the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, and the alleged "strong federal policy favoring arbitration" as justification for enforcing the arbitration agreement here. Appellant's Br. 9-11. But it is a "foundational FAA principle" that "[a]rbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1416 (2019) (quoting *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 299 (2010); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)); *see also Volt Inform. Sciences v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989) (stating

20

that arbitration "is a matter of consent, not coercion"); *Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021) (explaining that "mandatory arbitration is not the default form of dispute resolution but rather is permitted only when the parties agree to it"). If there is no agreement to arbitrate between the parties in the first place, the FAA's mandate to enforce arbitration agreements cannot apply. *See* JA 313 n.4 ("a feather need not be placed upon the scale on the side of arbitration claims where the parties dispute the existence of a validly formed and enforceable arbitration agreement") (cleaned up) (quoting *Weckesser v. Knight Enters. S.E., LLC*, 735 F. App'x 816, 821 (4th Cir. 2018)); *see also Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013) (explaining that FAA's "presumption" in favor of arbitration does not apply "when there remains a question as to whether an agreement even exists between the parties in the first place").

As Tidelands acknowledges, the question whether an arbitration agreement was formed is determined by looking to principles of state contract law. Def's Br. at 11-12; *Rowland*, 993 F.3d at 258. And the Supreme Court recently confirmed that the FAA prohibits applying those state law principles in a way that favors arbitration agreements over other contracts. *Morgan v. Sundance, Inc.*, 142 S.Ct. 1708, 1713-14 (2022). In *Morgan*, the Court reiterated that "the federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* at 1713. Or,

in other words, "[t]he policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). Thus, in deciding whether a contract was formed here, there is no thumb on the scale in favor of arbitration, as Tidelands suggests.

## II.    The district court correctly held Tidelands has not met its burden of proving the existence of an arbitration agreement that covers Ms. Marshall's claims

As the district court correctly recognized, the burden is on Tidelands to "establish the existence of a binding contract to arbitrate the dispute." JA 313 (quoting *Rowland*, 993 F.3d at 258 (cleaned up)). Because Tidelands does not challenge the district court's holding that the 2016 agreement does not apply to this dispute,[3] it must prove that the parties entered into a new agreement to arbitrate in 2020 that covers Ms. Marshall's 2020 claims. It has failed to do so.

Under South Carolina law, to prove that a contract was formed, Tidelands must show that it made an offer of contract terms and that Ms. Marshall accepted. *See Lampo v. Amedisys Holding, LLC*, 437 S.C. 236, 243 (S.C. Ct. App. 2022); *Edens v. Laurel Hill, Inc.*, 271 S.C. 360, 364 (S.C. 1978). But it has failed to show

---

[3] As the Magistrate Judge explained, the 2016 agreement applied only to the singular "application" and "application process," and nothing in the agreement indicated that it would apply to future applications or application processes. JA 314-315. Thus, when Ms. Marshall submitted a new application for employment in 2020, it was not governed by the 2016 agreement. JA 315 & n.6.

either that Ms. Marshall had notice of the contract terms being offered to her or that she manifested assent to an arbitration agreement by submitting her application.

> A.    *Tidelands cannot show Ms. Marshall had notice she was being offered an arbitration agreement that covered her 2020 application*

"A party cannot assent to something he does not know about, so the law in general requires that for an offer to be effective, the responding party must have reasonable notice of the offer's terms." *Lampo*, 437 S.C. at 242.; *see also* 1 Williston on Contracts § 4:16 (4th ed.) ("As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence").

In South Carolina, the Supreme Court has defined reasonable notice of an offer as requiring "actual notice," at least in the context of a contract modification. *See Fleming v. Borden, Inc.*, 316 S.C. 452, 463 (S.C. 1994); *Lampo*, 437 S.C. at 243 (S.C. Ct. App. 2022). Under South Carolina law, "actual notice is synonymous with knowledge," meaning "all the facts are disclosed and there is nothing left to investigate." *Strother v. Lexington Cnty. Rec. Comm'n*, 332 S.C. 54, 63 n.6 (S.C. 1998). On the other hand, "constructive notice"—also known as inquiry notice—"is a legal inference which substitutes for actual notice." *Id.* Inquiry notice is when a person has "knowledge of facts [that are] sufficient to put him on inquiry; if these facts were pursued with due diligence, they would lead to other undisclosed facts." *Id.* Here, Tidelands does not even attempt to argue that Ms. Marshall had actual notice. *See* Appellant's Br. 19-20. Nor could it given that it designed its online

application system to allow a returning applicant to submit their application without being informed about or required to view its arbitration agreement. *See* JA 365. But the Court need not decide whether there was actual notice because Tidelands has failed to prove even inquiry notice.[4]

> i. *The top of Tidelands' application webpage did not provide Ms. Marshall with notice of the offer to enter into a contract*

When Ms. Marshall logged into her account on the Tidelands website to update and submit her application in 2020, she was presented with an already filled-out application form with a "submit" button at the top of the page. JA 157; JA 202.[5] Most of the information she would need to update was located well above the arbitration agreement, so she could update that information and hit the submit button at the top without ever scrolling down to the arbitration agreement. JA 157; JA 202; JA 266-268. Indeed, the only information Ms. Marshall did update—the date she was available to start work—was near the top of the application. *See* Appellant's Br. at 7 (acknowledging that Ms. Marshall updated only her start date); JA 157; JA 202; JA 268.[6] And nothing at the top of the page or near the submit button notified her

---

[4] Although the Court should apply *Fleming*'s actual notice standard to these facts and conclude that Tidelands failed to show actual notice, this brief focuses on whether Ms. Marshall had inquiry notice because, if Ms. Marshall lacked even inquiry notice, she also lacked actual notice.

[5] Tidelands states that Ms. Marshall "had to check a box labeled 'I submit.' " Yet, the page it cites clearly has a button—not a check box—labeled "Submit," not "I Submit." JA 157, 159.

[6] Tidelands' own screenshot of the application webpage—which is oriented vertically and thus likely displays even more of the page than would appear on a standard laptop screen—confirms that the arbitration agreement was not visible on the same page as the field to update available start date. *See* JA 157-158; JA 202. Thus, it cannot meet its burden to prove that Ms. Marshall had notice of the arbitration agreement language.

that there were contract terms further down the page or directed her to scroll down and read the arbitration agreement before pressing submit. JA 157; JA 202.[7] Without that notice, Ms. Marshall cannot be expected to have guessed that there was an offer to contract hidden at the bottom of the page.[8] In short, because Ms. Marshall could update her application and click the submit button without ever seeing the arbitration agreement, and because there was no hyperlink or language near the submit button alerting her that she should scroll down to view an arbitration agreement, she had neither actual notice nor inquiry notice of the agreement's terms.

Under similar circumstances, courts have held that there was no inquiry notice—let alone actual notice—where the page lacked language drawing the user's attention to applicable contract terms. *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) (holding that there was no notice where there was hyperlink to terms on page but nothing directing user to read them); *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 31-32 (2d Cir. 2002) (Sotomayor, J.) (holding that there was no notice where user had to scroll below the "download" button to see

---

[7] Although the top of the page mentions that the application is subject to arbitration, it does not direct the applicant to the full arbitration terms at the bottom of the page. JA 157. Indeed, the unequivocal statement that the application is subject to arbitration gives the impression that the applicant has no choice in the matter, not that the applicant is being presented with an offer to enter into a contract whose terms are set forth below. Tidelands could easily have used this language to draw attention to the arbitration terms at the bottom of the application, but it did not do so. *See* JA 366; JA 319 n.8.

[8] As shown below, even if Ms. Marshall had seen the arbitration agreement further down the screen, at most she would have seen that she had agreed to arbitration in 2016; it would not have put her on notice that she was being offered a new agreement covering her 2020 application.

terms of service and nothing above the "download" button indicated that there were terms further down); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (holding that there was no inquiry notice where plaintiff could not see the link to terms and conditions without scrolling down, which she did not need to do to complete her purchase).

On the other hand, where a website *does* provide conspicuous notice via hyperlink or other means that there are contract terms that the user is agreeing to by their conduct like continuing to use the site or clicking a button, courts have found that there is inquiry notice, even if the user does not read the terms. *See, e.g.*, *Lampo*, 437 S.C. 236, 245 (S.C. Ct. App. 2022); *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016).

Indeed, the cases cited by Tidelands illustrate the type of notice that would have been sufficient had Tidelands chosen to provide it here. In *Lampo*, the employer sent employees an email entitled "Important Policy Change – Must Read," which then directed employees to click on a hyperlink to download documents that they were "required" to read, indicating that the documents were time-sensitive and may affect the employees' legal rights. 437 S.C. at 239. In turn, clicking the link brought up a pop-up screen stating that the materials included an arbitration agreement and explaining some of the key terms of the arbitration agreement, like the time period

for opting out of arbitration. *Id.* at 239-40. The pop-up asked employees to affirmatively click a button to acknowledge that they had received the documents and were required to read them. *Id.*

The court found that these efforts were sufficient to provide notice of the arbitration provision, but cautioned that they "may well be at the outer limits of what constitutes a valid offer." *Id.* at 244. Tidelands' webpage here goes far beyond those "outer limits." Crucially, there is no doubt that the employees in *Lampo* were on notice that there were important documents that they must read. *Id.* at 239. To the extent they failed to read the documents, they were taking a known risk that their rights could be affected. Here, on the other hand, Ms. Marshall had no notice at all— let alone the kind of clear notice provided in *Lampo*—that there was language below her application that she should read because it could change her legal rights by binding her to arbitration. If the employer's notice in *Lampo* represented the "outer limits" of sufficient notice, Tidelands' application page is not even in the ballpark.

*Moultry v. Tony Serra Ford, Inc.*, 2019 WL 2392443 (N.D. Ala. June 6, 2019), is even more removed from this case. There, the applicant was required to scroll through an arbitration agreement before submitting their application. *Id.* at *5. Unlike here, there was no submit button at the top. *Id.* And at the bottom of the application, there was a signature box with the language "I agree to the Terms of Use, Consumer Disclosure, and all pages above," therefore directing the applicant

to the arbitration agreement in the pages above if they had missed it when scrolling down. *Id.* Further, when the applicant clicked in the signature box, language appeared specifically calling the applicant's attention to the arbitration agreement and warning them that they should review it before submitting their application. *Id.* Here, on the other hand, there was no language near the submit button at the top of the page indicating that there were contract terms that would be binding on Ms. Marshall if she clicked "submit." JA 157.

Tidelands cites *Clark v. Goldline Int'l, Inc.*, 2010 WL 4929438, at *5-6 (D.S.C. Nov. 30, 2010), as support for the proposition that Ms. Marshall was required to scroll down and read the arbitration agreement. But that case is inapposite. To begin with, *Clark* is a case interpreting California unconscionability law, not contract formation under South Carolina law, which is the issue here. *See id.* at *4. The question in *Clark* was whether an arbitration provision was procedurally unconscionable on the basis of "surprise" because it was hidden within a larger contract. *Id.* The court held that it was not procedurally unconscionable because the larger contract—which there was no dispute the plaintiff had received and agreed to—listed the arbitration agreement in the table of contents, and the arbitration agreement was capitalized and in bold letters. *Id.* at *4-5. The court explained that the plaintiff's failure to notice the arbitration provision did not make it unconscionable. *Id.* at *6.

Here, on the other hand, there was nothing on the application webpage to put Ms. Marshall on notice that there was a contract being offered to her. She should not be required to guess that there might be contract terms at the bottom of the page that she must scroll down to see.[9] *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (explaining that "to be bound" to an online agreement, "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available *as long as she has notice of their existence*") (emphasis added). The Second Circuit held as much under similar circumstances in *Specht*, explaining that the fact that the website user "may have been aware that an unexplored portion of the Netscape webpage remained below the download button does not mean that they reasonably should have concluded that this portion contained a notice of license terms." 306 F.3d at 31-32 (2d Cir. 2002). Likewise, even if Ms. Marshall knew that there was additional content on the website below her application, there is no reason that she should have concluded that the submerged content was contract terms that were being offered to her.

For those same reasons, the South Carolina cases cited by Tidelands for the general proposition that a party should read a contract before signing—neither of which concern notice or contract formation—are also inapplicable here: that

---

[9] Again, the presence of the language stating that the application was subject to arbitration was insufficient to give Ms. Marshall notice that she was being presented with an offer to enter into a contract with specific terms that were further down the page.

proposition applies only if the party first has notice that there *is* a contract. *See Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 541 (S.C. 1981) (arbitration agreement was not procedurally unconscionable because plaintiffs failed to read it); *First Baptist Church of Timmonsville v. George A. Creed & Son, Inc.*, 276 S.C. 597, 599 (S.C. 1981) (noting that rule that party cannot escape obligation to arbitrate by declaring they did not read the contract "is especially true where, as here, the party seeking to avoid the provision does not dispute the validity of the contract *or that it was entered into*") (emphasis added).[10]

In sum, nothing on the page of Tidelands' website that was visible to Ms. Marshall when she modified and submitted her application would have put her on notice that there were contract terms being offered to her that she must scroll down to see. And because Tidelands has not submitted any evidence showing that Ms. Marshall did scroll down, the analysis should end there.

ii. *The already-completed agreement at the bottom of the page did not provide Ms. Marshall with notice of a new offer to enter into a contract*

Even if Ms. Marshall did decide to scroll down and view the arbitration agreement terms—which there is no evidence she did—there was nothing on the

---

[10] Tidelands also cites *Herron v. Century BMW*, 387 S.C. 525 (S.C. 2010), but that opinion was vacated by the U.S. Supreme Court and therefore cannot be cited as precedent. *See Sonic Automotive, Inc. v. Watts*, 563 U.S. 971 (2011). In any event, its holding is similar to that in *Munoz*—that failure to read a contract does not make it unconscionable—so it does not apply to the formation question at issue here.

page to put her on notice that Tidelands was offering her the opportunity to enter into a *new* contract governing her 2020 application. At the very bottom of the application form was a "Pre-Employment Statement" that included an "Agreement to Arbitrate." JA 158. And at the bottom of that was a check-box next to the words "I ACCEPT." JA 159; JA 269. But the box on Ms. Marshall's application was already checked, and next to it was her name and the 2016 date she had originally submitted an application and accepted the agreement. JA 269.

For that reason, Tidelands' assertion that Ms. Marshall went through the "exact same process" in 2020 as in 2016 is false. Def's Br. 14 (emphasis in original). In 2016, she had to scroll through the arbitration agreement language and affirmatively check the "I ACCEPT" box before she could submit her application. But in 2020, not only could she update and submit the application without ever scrolling through the arbitration agreement, even if she did scroll down, the fact that the "I ACCEPT" box was already checked with the 2016 date would indicate to Ms. Marshall that she was simply reviewing the 2016 agreement she had signed, not being presented with *new* contract terms to agree to. Again, that makes this case different from *Moultry*, where the applicant was filling out an application for the first time and was required to affirmatively sign at the bottom of the application. *See* 2019 WL 2392443, at *15.

B.     *Tidelands has not met its burden of proving that Ms. Marshall assented to the arbitration agreement by clicking "submit"*

Not only has Tidelands failed to meet its burden of proving that Ms. Marshall had notice of the contract terms offered to her, but it has also failed to prove that she assented to those terms. To begin with, Tidelands has not produced credible evidence showing Ms. Marshall's assent. As the district court found, "Defendant's online employment application system generates a signed, time- and date-stamped employment application even when an applicant clicks the 'save & return later' button rather than the 'submit' button." JA 321; *see also* JA 269-270. Thus, the evidence produced by Tidelands is insufficient to even prove that Ms. Marshall in fact engaged in the conduct that it contends manifested her assent—clicking the "submit" button.

But even if Tidelands can prove Ms. Marshall did click the "submit" button, Tidelands cannot prove that its website put her on either actual or inquiry notice that, by clicking the button, she would be assenting to the arbitration terms. Without that notice, clicking on the button is not a manifestation of her assent. It is hornbook law that a contract can be accepted by conduct only if the offeror has made clear what kind of conduct will manifest acceptance. *Lampo*, 437 S.C. at 431 ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree *in a manner invited or required by the offer*." (quoting Restatement (Second) of Contracts § 50 (1981) (emphasis added))); Restatement (Second) of Contracts § 19

32

(explaining that a party can assent by conduct only if he "knows or has reason to know that the other party may infer from his conduct that he assents"). As the Second Circuit has explained, "clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms." *Specht*, 306 F.3d at 29-30 (2d Cir. 2002); *see also Meyer*, 868 F.3d at 75 ("layout and language of the site" must "give the user reasonable notice that a click will manifest assent to an agreement" (quoting *Sgouros*, 817 F.3d at 1033-34)); *Selden*, 4 F.4th at 156 (similar).

> i.    *The top of Tidelands' application page did not provide notice that clicking "submit" would manifest assent to an arbitration agreement*

There is nothing near the "submit" button at the top of the page indicating that, by clicking that button, Ms. Marshall would be manifesting assent to a contract. Although the page did notify Ms. Marshall that "this application and application process is subject to arbitration," JA 173, it did not indicate that, by clicking submit, she was agreeing to arbitration. *See* JA 319 n.8 ("nothing in that three-line notice . . . indicate[s] that by clicking the 'submit' button at the top of the page to apply for a position, the applicant is agreeing to the terms in the Agreement to Arbitrate"). To the contrary, it created the impression that she had already agreed to arbitration, whether she clicked "submit" or not. *See Nguyen*, 763 F.3d at 1179 (link to terms of

33

service next to relevant button was insufficient to provide notice without additional language indicating that clicking the button would bind the user to the terms).

In contrast, in *Meyer* and *Seldin*, the language next to the button not only alerted the user to the existence of contract terms but explained clearly what conduct would constitute acceptance of those terms. *See Meyer*, 868 F.3d at 78 (finding assent where, directly under the button a user had to click to register for account, there was a warning stating, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"); *Selden*, 4 F.4th at 156 (finding assent where, directly below the sign-up button, website stated, "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms").

And the facts of this case are even more removed from websites like the one at issue in *Sgouros*, which required the user to click a button labeled "I accept." 817 F.3d at 1033. As the Magistrate Judge noted, in contrast to words like "accept" or "acknowledge," nothing about the word "submit" suggests that the user is agreeing to anything, so the button alone could not have put Ms. Marshall on notice that clicking it would bind her to an agreement. JA 319 (citing dictionary definition of submit). In short, Tidelands cannot prove that Ms. Marshall assented to arbitration by submitting her application because it cannot show that anything on the portion of

34

the website she necessarily viewed told her that clicking "submit" would manifest her assent to an arbitration agreement.

> ii. *The already-checked box at the bottom of the page did not provide notice that clicking submit would constitute acceptance of the agreement*

Even if Ms. Marshall scrolled down, there was still nothing below her application to put her on notice that submitting the application would manifest her assent to arbitration. The box at the bottom of the arbitration agreement was already checked, indicating only that she had agreed to arbitration in 2016. There was no notice that, by doing nothing and leaving that box checked, she would be manifesting assent to a new arbitration agreement that covered her 2020 application.

Again, the existence of the already-checked box with the 2016 date makes the 2020 application process fundamentally different than the process Ms. Marshall went through in 2016 to agree to arbitration. In 2016, she was required to affirmatively check the "I ACCEPT" box before clicking "submit," and below the box was language stating "By checking the box above next to the 'I ACCEPT' button, I am . . . agreeing to the PRE-EMPLOYMENT STATEMENT which contains the Agreement to Arbitrate, and other items all of which I am agreeing to, certifying, and admitting that I understand those provisions." JA 177. As in the cases cited by Tidelands, that language unambiguously put her on notice that taking the affirmative step of checking the box would constitute agreement to arbitration. *See*

*Moultry*, 2019 WL 2392443, at *5; *Sutton v. Coinbase, Inc.*, 354 F. Supp. 3d 156 (E.D.N.Y. 2019); *see also Meyer*, 868 F.3d at 78 (explaining that courts uphold so-called "clickwrap" agreements because "the user has affirmatively assented to the terms of agreement by clicking 'I agree'").

Although the 2020 agreement contained that same language, the affirmative act the website directed her to take to accept the agreement—checking the box—appeared to have already been taken years earlier. She could not check the box to accept the agreement because it was already checked. Although Tidelands contends that failing to uncheck the box demonstrated her assent to the agreement, the webpage did not notify her that unchecking the box was even an option, let alone that, by doing nothing at all, she was accepting a new agreement. Had Tidelands intended leaving the box checked to indicate assent, it could have included language on the application stating that. Instead, unchecking the box appeared futile in light of the 2016 date next to it, indicating that Ms. Marshall's acceptance had already been registered. As a result, she cannot be said to have manifested her assent to the contract simply by doing nothing and leaving the box checked, particularly when Tidelands cannot even prove she saw the box.

In short, Tidelands was the master of its offer. It could have included language at both the top and the bottom of the page making clear that clicking submit while leaving the "I ACCEPT" box checked would manifest an applicant's assent to an

36

arbitration agreement. Tidelands' failure to provide notice of how to accept its offer is fatal to its theory that Ms. Marshall agreed to arbitration by submitting her application.

### III. Even if an arbitration agreement was formed in 2020, the district court's decision should be affirmed on the alternative ground that the 2020 agreement does not cover this dispute

Because the district court held that no agreement was formed in 2020, it did not reach the issue of whether this dispute falls within the scope of the arbitration agreement language. But this Court may affirm the district court's decision on the alternative ground that this dispute is outside the scope of that agreement.[11] *See United States v. Flores-Granados,* 783 F.3d 487, 491 (4th Cir. 2015) (recognizing that Court may "affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court").

Once again, the "first principle" that the court must consider is that "arbitration is strictly a matter of consent." *Granite Rock*, 561 U.S. at 299. "The most basic corollary of the principle that arbitration is a matter of consent is that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration." *Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906, 1923 (2022) (internal quotation marks omitted). A party "cannot be coerced into arbitrating a

---

[11] Additionally, reaching this issue would promote judicial economy because it will likely need to be decided at the class certification stage to determine whether arbitration agreements signed by class members cover this dispute. Providing guidance on this issue now would avoid the need for appellate review of the issue after class certification.

claim, issue or dispute absent an affirmative contractual basis for concluding that the party agreed to do so." *Id.* (internal quotation marks omitted); *see also Volt Inform. Sciences*, 489 U.S. at 479 (parties "are generally free to structure their arbitration agreements as they see fit," including by "limit[ing] by contract the issues which they will arbitrate).

Here, there is nothing in the arbitration agreement that indicates an intent to cover this dispute, which is solely about discrimination that occurred after Ms. Marshall was offered and accepted a job with Tidelands. The agreement, which is entitled "*Pre-Employment* Statement," applies by its plain terms only to "disputes or controversies arising out of or relating to *your application for employment and application process.*" JA 175 (emphasis added). Unlike many arbitration agreements, it does not include disputes relating to or arising out of the employment relationship itself. And although the phrase "relating to or arising out of" is broad, "it is not limitless." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011). Both "arising out of" and "relating to" serve to limit the scope of the agreement to only those disputes with a "direct relationship" to the application or application process. *Id.*; *see also N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (noting that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy," it would be a "sham" limitation, because "really, universally, relations stop nowhere").

Indeed, if the arbitration agreement were to apply to all disputes involving Ms. Marshall's employment with Tidelands, the specific reference to the application and application process would have no purpose. The Court should decline to read the agreement that way. *See Mears Group, Inc. v. Kiawah Island Utility, Inc.*, 372 F. Supp. 3d 363, 373 (D.S.C. 2019) (explaining that "principles of South Carolina contract interpretation dictate that contracts will be interpreted so as to give effect to all their provisions") (cleaned up); *Ryals v. ILA Local 1771*, 33 F.Supp.3d 634, 643 (D.S.C. 2014) ("Contracts are read to give meaning to all terms, and the court will not strain to interpret a contract in such a way as to render a clause superfluous."); *see also Doe*, 657 F.3d at 1218 (concluding that if language limiting arbitration agreement to disputes "relating to" or "arising out of" services provided as an employee "did not limit the scope of the arbitration provision, it would have no purpose, and that is an interpretive no-no").

That is particularly so where it would have been simple to add language to the agreement that would expand its scope to the entire employment relationship, as is common in employment contracts. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109-10 (2001) (arbitration agreement applying to "claims, disputes or controversies arising out of or relating to my application or candidacy for employment, employment and/or cessation of employment"); *Lamps Plus*, 139 S.Ct. at 1419 (Thomas, J., concurring) (arbitration agreement applying to "all claims that

may hereafter arise in connection with my employment").[12] That Tidelands chose to use narrower language is a strong indication of its intent to limit arbitration to only disputes concerning the pre-employment application process.

Because this dispute arose only after Tidelands offered Ms. Marshall employment and she accepted, it has no "direct relationship" to her employment application or the application process. *Doe*, 657 F.3d at 1218. Instead, it is a dispute about the parties' employment relationship and Tidelands' decision to terminate Ms. Marshall for failing to pass the physical agility test. Indeed, Tidelands cannot argue that its medical examination of Ms. Marshall was part of the "application process," as the ADA prohibits medical examinations during the application process before a job offer is made. *See* 42 U.S.C. § 12112(d)(2)(A) & (d)(3); *Malone v. Greenville Cnty.*, 2008 WL 4557498, at *4 (D.S.C. Aug. 11, 2008) (explaining that the ADA requires that "all elements of the application process" be complete before a medical examination can be conducted).

Moreover, although it is true that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24-25 (1983), that rule applies only when

---

[12] Tidelands created its online application system and arbitration agreement in 2016, well after the *Circuit City* decision, and well after it was commonplace for large employers like Circuit City to include such language in their arbitration agreements. Thus, Tidelands knew how to cover the parties' employment relationship if it wanted to do so.

the "agreement is ambiguous about whether it covers the dispute at hand," *Granite Rock Co.*, 561 U.S. at 301. Here, there is nothing ambiguous about the agreement's narrow scope: it is limited to the "application" and "application process." In short, nothing in the FAA requires the Court to "coerce" the parties to arbitrate a dispute that is not covered by the plain language of the agreement to arbitrate. *Viking River Cruises, Inc.*, 142 S.Ct. at 1923.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's denial of Tidelands' motion to compel arbitration.

Dated March 17, 2023                          Respectfully submitted,

                                              /s/ Shelby Leighton

                                              Shelby Leighton
                                              PUBLIC JUSTICE
                                              1620 L ST. NW, Suite 630
                                              Washington, DC 20036
                                              (202) 797-8600
                                              sleighton@publicjustice.net

                                              David A. Nauheim
                                              NAUHEIM LAW OFFICE, LLC
                                              PO Box 31458
                                              Charleston, SC 29417
                                              (843) 534-5084
                                              david@nauheimlaw.com

                                              *Counsel for Appellee*

41

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 22-2010   **Caption:** Marshall v. Georgetown Memorial Hospital

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___10,199___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
14 pt. Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Shelby Leighton _____

Party Name Loretta Sabrina Marshall _____

Dated: March 17, 2023 _____